

**SO ORDERED.**

**SIGNED this 31 day of July, 2009.**

_____
A. Thomas Small
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:                                                                                          CASE NO.

**CAROLINA WINE COMPANY, INC.**                              09-02275-8-ATS

    DEBTOR

ORDER ALLOWING MOTION TO APPROVE COMPROMISE
AND DENYING MOTIONS FOR TURNOVER

The matters before the court are the motion to approve compromise filed by the chapter 7 trustee and the motions for turnover filed by Larry Landman, Carl Esrey, and Edward Horton. A hearing took place in Raleigh, North Carolina on July 16, 2009.

Carolina Wine Company, Inc. filed a petition for relief under chapter 7 of the Bankruptcy Code on March 20, 2009, and Richard D. Sparkman was appointed trustee. Prior to filing, the debtor sold wine, operating its business primarily through internet and telephone orders. The debtor maintained three warehouses in which it stored wine until a customer requested delivery. RBC Bank holds a note with a balance of in excess of $324,000, secured by the debtor's inventory. RBC maintains that all of the wine located in the debtor's warehouses on the petition date is part of RBC's collateral. The trustee and RBC have reached a compromise regarding the priority of RBC's lien over the interest of the estate in all of the wine inventory. RBC is to pay $25,000 to the trustee, as

well as assume all administrative rent and utility claims against the estate, plus mailing costs, collectively estimated to be approximately $70,000, in exchange for possession of all of the wine inventory at the debtor's premises. After the inventory is liquidated, any funds in excess of the lien payoff, costs, interest, attorney's fees, and the administrative expenses will be paid to the estate. The trustee and RBC seek approval of the compromise, but the compromise is conditioned upon a finding by the court that all of the wine inventory is property of the estate.

Numerous customers objected to the motion to approve compromise, contending that certain of the wine stored in the debtor's warehouse belonged to customers. In almost every instance, the customers paid for the wine in advance, and Carolina Wine was storing the wine until the customers made arrangements for delivery. In some cases, the wine had been stored at Carolina Wine for several years.[1] The customers maintain that the wine was held for them, and was not part of the debtor's inventory subject to RBC's security interest. First Citizens Bank, which held the Visa and Mastercard merchant accounts for Carolina Wine, supports the customers' position and contends that it is subrogated to the rights of those customers who were reimbursed by their credit card companies for undelivered wine.

Robert C. Peel, the debtor's principal, testified at length about how the business was conducted. In general, when Mr. Peel became aware of a wine that he thought would be popular with his customers, he would order several cases of it from the distributor, then send out a "blast" email to his customers to pre-sell the wine before it arrived. Each wine was different, but some wines were ordered a year or more before they became available, so that the pre-sales occurred well

---

[1] The testimony established that 75 percent of the wine at the warehouse had been there since at least 2007.

in advance of when the wine arrived at the Carolina Wine warehouse. Customers who ordered the wine through the pre-sale process paid for the wine at the time of the order. Once the wine arrived, the debtor contacted the customers who pre-purchased the wine to arrange for delivery. At that point, the customers either picked up the wine, paid to have the wine shipped, or asked Carolina Wine to store the wine for them. The wine that was not pre-sold was advertised for sale both before and after receipt by the debtor.

Ideally, wine was labeled with the customer name and segregated in the warehouse, but that did not occur. Several weeks before filing the bankruptcy petition Mr. Peel and his wife went into the warehouse and discovered that boxes were improperly labeled, wine was not stored where they thought it would be, and lists of what wine was "owed" to which customers were inaccurate. The Peels spent considerable time reviewing the point of sale system and trying to sort through and box wine for each customer. However, the fact that they were required to take these steps demonstrated that the ordinary course of business for Carolina Wine was *not* to segregate and label the wine for each customer as it arrived.

Mr. Peel further testified that once he ordered wine from the distributor, Carolina Wine was obligated to purchase the wine whether or not he was able to pre-sell any of it. Further, if the customers decided after pre-purchasing a wine that they did not want that wine, they could get a refund or apply their payment toward the purchase of a different wine. If the wrong wine was delivered by the distributor to Carolina Wine, the debtor refunded the customers' money plus 10 percent.

Mr. Peel also testified that sales were reflected on the debtor's books when the wine was shipped or picked up, and sales tax, if applicable, was paid at that time. He was uncertain whether

all of the wine in the warehouses, including the wine that had been paid for by customers, was identified as inventory when Carolina Wine obtained its loan from RBC, though he believed that if it was, there would also have been a corresponding indication of what was owed to the customers.

RBC maintains that title did not pass to the customers until the wine was delivered, and all of the wine in the debtor's warehouse was part of its collateral. RBC relies on Abbott v. Blackwelder Furniture Co. of Statesville, Inc. (In re Blackwelder Furniture Co. of Statesville, Inc.), 33 B.R. 399 (W.D.N.C. 1983), and In re Surplus Furniture Liquidators, Inc. of High Point, 199 B.R. 136 (Bankr. M.D.N.C. 1995). In both of those cases, the courts considered whether furniture that had been paid for, tagged as "sold" and labeled with the customers' names, but remained in the furniture store debtors' possession, was the property of the customers or the property of the estate. Both courts considered the issue to be a question of title, and applied the rules set forth in Article 2 of the Uniform Commercial Code as adopted by North Carolina General Statutes § 25-2-101 et seq.

Section 25-2-401 controls the passage of title to goods. Where there is no explicit agreement between the parties, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." N.C. Gen. Stat. § 25-2-401(2). Where there is no explicit agreement and "where delivery is to be made without moving the goods, . . . [then] (b) if the goods are at the time of contracting already identified and no documents of title are to be delivered, title passes at the time and place of contracting." N.C. Gen. Stat. § 25-2-401(3).

In Surplus Furniture, the court held that because the contracts required the debtor to deliver the furniture to the buyer's homes (either by delivering on the debtor's trucks locally or shipping by common carrier for longer distances), title would pass to the customers on tender of the furniture

4

to the customers in their homes. 199 B.R. at 140. The court also noted that the debtor bore the risk of loss to the property until delivery.

In <u>Blackwelder</u>, the court distinguished between customers who personally appeared at the debtor's showroom, selected stock items from the floor, had those items tagged by an employee as "sold" to them and paid for the items in full, from customers who placed off-site orders for furniture, where delivery was either to be effected by van line or common carrier, or by the debtor's truck, or picked up by the customer. The court held that where the seller had performed its delivery duties, or where no such contractual duties existed, the buyers were given title to the merchandise; but, where delivery duties were part of the contract and had not been completed, no title passed. 33 B.R. at 404. The <u>Blackwelder</u> court also noted that the debtor bore the risk of loss for all merchandise prior to shipping.

The customers attempt to distinguish <u>Surplus Furniture</u> and <u>Blackwelder</u> by arguing that shipping or delivery of the wine was to be arranged separately from the contract to purchase, and thus delivery was not necessary for the contract to be complete and the title to pass to the customers. The customers cite to no authority to support this position, and while this argument may have some appeal to relieve the harsh result dictated by precedent, the uncontroverted evidence is that at all times the parties understood that the wine was to be picked up or shipped (or, in a few instances, delivered by the debtor). In addition, Carolina Wine bore the risk of loss, and of receiving the wrong product, in which case it refunded an additional 10 percent to customers who ordered the undelivered product. Customers were able to cancel their orders any time prior to delivery, whether or not the wine they ordered was available in the debtor's warehouse. All of these facts demonstrate that title to the wine remained with the debtor until delivery.

Three of the customers filed motions for turnover, raising the same arguments discussed above. The motion for turnover is akin to a request for specific performance, which was discussed in the Surplus Furniture opinion. Significantly, Judge Stocks found that specific performance was not available to the customers who had paid for furniture that was tagged in their names but remained on the debtor's premises for several reasons. First, the furniture was not unique because it could be easily purchased from other manufacturers and retailers. Second, the buyers had an adequate remedy at law because they had the right to recover the amount paid to the defaulting seller. "The fact that a buyer has paid in full for the goods but has not received them does not constitute grounds for the equitable remedy of specific performance." Surplus Furniture, 199 B.R. at 141. Further, though the customers may be unable to recover the full price from the debtor, "under state law the objecting customers had an adequate remedy at law and would not have been entitled to specific performance if no bankruptcy had been filed." 199 B.R. at 141.

In this case, there is no evidence that the wine at issue could not have been purchased from other wine retailers. While some of the older wine may be difficult to get now, the difficulty in replacing that product arises from the customers' failure to arrange for delivery of their wine over a number of years, and not because the product was unique to Carolina Wine. In addition, each bottle of a particular wine is interchangeable with another bottle of that wine, and the evidence was that bottles were often removed from a box designated for one customer to fill another customer's order. Thus, even the wine that appeared to have been identified for a particular customer was not truly segregated and reserved for that customer, meaning the wine is not unique as required for specific performance. In addition, the fact that the customers could have pursued a refund from the

debtor had no bankruptcy been filed demonstrates that there is an adequate remedy at law, and specific performance is not available.

One customer, Dr. Horton, did have his wine truly segregated and marked. Dr. Horton's many cases of wine were stacked on two pallets, with shrinkwrap around the cases, ready to be shipped upon Dr. Horton's arranging for shipment. Dr. Horton maintains that even if the court finds that the other wine in the warehouse is property of the estate, his wine is distinguishable and he should be able to take possession of his wine if he arranges and pays for shipment. While the facts surrounding Dr. Horton's wine come close to showing that the wine was held for his benefit, Carolina Wine still bore the risk of loss until the wine was shipped and, consistent with the debtor's policy, Dr. Horton could at any time have asked for a refund or a substitution of wine. In addition, the debtor had no program for long term storage of wine, and keeping the wine that had been ordered by Dr. Horton for several years was outside of the debtor's usual course of business.

In Surplus Furniture, Judge Stocks concluded that the customers were entitled to an equitable lien on the furniture, which entitled them to payment from the proceeds of the furniture. Specifically, the court held that

> where specific items of personal property were purchased by the customers, fully paid for by the customers, marked by the seller as belonging to the customers and were being held by the seller solely for shipment to the customers at no further charge to the customers, those customers may claim an equitable lien against the items of personal property in the possession of the seller.

199 B.R. at 144. There are two remaining, and essential, facts that destroy any of these customers' claims to an equitable lien: first, the customers were all to be charged an additional fee for shipment of the wine, and second, with the possible exception of Dr. Horton's wine, none of the wine was truly marked by the seller as belonging to the customers given that even the marked boxes often

7

contained the wrong wines and were subject to having wine removed from them to fill another order. Thus, the facts justifying the imposition of an equitable lien in <u>Surplus Furniture</u> do not exist here.

Like the courts in <u>Blackwelder</u> and <u>Surplus Furniture</u>, this court is not unsympathetic to the customers' situation. Anticipating this situation, Congress provided a priority claim for customers who paid a deposit for goods not received. Section 507(a)(7) provides a seventh priority to "unsecured claims of individuals, to the extent of $2,425 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase . . . of property . . . for the personal, family or household use of such individuals, that were not delivered or provided." 11 U.S.C. § 507(a)(7). As the <u>Blackwelder</u> court explained,

> The Court realizes that from the unsecured Creditors' perspective, Bankruptcy laws result in seemingly unequitable treatment of unsecured creditors who receive little, if any, reimbursement of their loss.
> \* \* \*
> However, the Bankruptcy Act was enacted for the purpose of providing an orderly method of distribution among the unsecured creditors what little is left after administrative claims and the secured creditors have recovered the property or proceeds of their security interest. . . . [I]n an attempt to ameliorate to some extent the loss they have suffered [Congress] has included a new priority in Section 507(a)[7] which obviously does not make these and other plaintiffs similarly situated whole, but does recognize their plight. However, it also reinforces the opinion of this Court that it was not the intent of Congress that creditors in the Plaintiffs' position shall be entitled to any further consideration than is expressed in Section 507(a)[7].

<u>Blackwelder</u>, 33 B.R. at 406.

In conclusion, the court finds that the wine being held by the debtor is property of the estate because title never passed to the customers. In addition, the customers are not entitled to an equitable lien or to turnover of the wine. Based on those findings, the court finds that the compromise between RBC and the trustee is reasonable and beneficial to the estate, and the motion

8

to approve the compromise is **ALLOWED**.  The motions for turnover are **DENIED**.

    **SO ORDERED**.

**END OF DOCUMENT**